IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AFFIDAVIT IN SUPPORT OF A SEIZURE WARRANT

DEBRA L. LaPREVOTTE, being duly sworn, deposes and states as follows:

## INTRODUCTION

1. I am a Special Agent ("SA") employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for nine (9) years. Currently, I am assigned to the Asset Forfeiture/Money Laundering Squad in the FBI's Washington, D.C. Field Division (Northern Virginia Resident Agency). My investigative assignments include money laundering as it relates to the proceeds of bank fraud, wire fraud and mail fraud schemes, as well as a variety of white collar investigations. I have received extensive training in Advanced Money Laundering Techniques and Complex Financial Manipulation.

2. I am currently assisting SA Sherri Queener, FBI, Washington Field Office, (Northern Virginia Resident Agency) who has been employed as a Special Agent for the Federal Bureau of Investigation since October 5, 2003. SA Queener is currently assigned to the Health Care Fraud Squad CR-19. SA Queener is also working with investigators from the Department of Health and Human Services Office of the Inspector General and the District of Columbia Medicaid Fraud Control Unit.

3. I submit this affidavit in support of an application for a seizure warrant for the following item:

>All funds on deposit at Wachovia Bank account, #xxxxxxxxxxx7137, in the name of Solomon-Crozier Construction Company, on or after receipt of $20,000 wired from Mr. Robert King on September 29, 2005.

4. Unless otherwise stated the information in this affidavit is either personally known by me or was provided to me by other law enforcement officers, a review of various documents or records, and witness interviews as described herein. The information in this affidavit does not include each and every fact known to the government, rather it only includes the information necessary to prove that probable cause exists for a seizure warrant to be issued for property that represent proceeds of a violation of Title 18, United States Code Section 1347 (Health Care Fraud) and Title 18, United States Code Section 1035 (False Statements Regarding Health Care Matters), and/or proceeds of or property involved in a violation of Title 18 United States Code Section 1956(a)(1) (Money Laundering). Property that constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" as defined in section 1956(c)(7) of Title 18 is subject to seizure and forfeiture under Title 18, United States Code, Sections 981(a)(1)(C) and 981(b), and property involved in or traceable to a money laundering transaction is subject to seizure and forfeiture under Title 18, United States Code, Sections 981(a)(1)(A) and 981(b). Under Title 18, United States Code, Section 1956(c)(7)(F), the term "specified unlawful activity" includes any act or activity constituting an offense involving a Federal health care offense – including Health Care Fraud (18 U.S.C. § 1347) and False Statements Regarding Health Care Matters (18 U.S.C. § 1035(a)(2)).

5. For the reasons set forth below, probable cause exists to believe that the funds due to S-C Properties from the September 2005 refinance of the residence located at xxxxxxxxxxxxxxxxxxxxxxxxxxxx, Dallas, Georgia are subject to seizure and forfeiture under Title 18, United States Code, Section 981 because the funds at issue are traceable to health care fraud proceeds and, furthermore, such proceeds were involved in one or more money laundering

transactions.

## SUMMARY OF PROBABLE CAUSE

6. Or about May 26, 2005, a Grand Jury sitting in the District of Columbia indicted LARRY SOLOMON for, among other things, Health Care Fraud, in violation of Title 18, United States Code, Section 1347, and False Statements Regarding Health Care Matters, in violation of Title 18, United States Code, Section 1035(a)(2). A copy of the Indictment is attached hereto and incorporated herein by reference.

7. As described in the Indictment and further detailed herein, until his activity stopped earlier this year, LARRY SOLOMON engaged in a scheme to defraud Medicare and Medicaid using businesses or entities that included BPS Medical and Diversified Medical, by submitting claims to these Federal Health Care programs, or causing claims to be submitted to the programs, for services that LARRY SOLOMON knew had not been rendered.

8. Investigation further reveals that proceeds from false and fraudulent claims that LARRY SOLOMON submitted or caused to be submitted to Federal Health Care programs were received into bank accounts that he controlled and that such proceeds were then laundered and used by him to purchase real property located at xxxxxxxxxxxxxxxxxxxxxxxxxx, Dallas, Georgia.

9. Investigation reveals that in late 2003, LARRY SOLOMON and a business partner, through a business known as S-C Properties, Inc., contracted to purchase a property located at xxxxxxxxxxxxxxxxxxxxxxxxxx, Dallas, Georgia from an individual named Robert King. Mr. King entered into an agreement with S-C Properties, Inc. (LARRY SOLOMON and one partner) under which S-C Properties, Inc. would make payments on the Georgia property while the

residence remained in Mr. King's name. This agreement appears to be similar to a rent to own option, and is called a bond for title deal.

10. Investigation reveals that from August 2003 through August 2004, LARRY SOLOMON and/or S-C Properties, Inc. paid over $89,000 to Homecomings Financial Mortgage Corporation toward the purchase of the Georgia property. Your affiant has reviewed bank records which reveal that these payments were made from various BPS accounts, and other business accounts at Wachovia Bank, that LARRY SOLOMON controlled and through which fraud proceeds were laundered. Review of the activity in LARRY SOLOMON's bank accounts during the scope of the scheme revealed in excess of $1.6 million in payments to SOLOMON-owned accounts from Medicare and Medicaid billings.

11. For example, and as set forth in Count Two of the Indictment, a review of Medicare records and records obtained from financial institutions reveals that BPS Medical, an entity controlled by LARRY SOLOMON, billed Medicare on July 29, 2003, under CPT Code 99349, for home care services allegedly performed on that date to patient DM133. Investigation reveals that patient DM133 did not receive medical treatment that corresponds to CPT Code 99349 on July 29, 2003. Instead, DM 133 was in the hospital from July 28, 2003 through August 8, 2003, receiving treatment by other health care providers. LARRY SOLOMON never saw DM133 on the date he billed Medicare for his services because that patient was in the hospital. Medicare reimbursed BPS Medical $85.05 for this claim by wiring funds to the BPS account at Wachovia Bank (#XXX2054) in August 2003. Thereafter, funds were transferred from the BPS account to a Solomon Administrative and Medical Services ("SAMS") account (#XXX9658). After funds were transferred from the BPS account into the SAMS account, a check in the amount of $5,000,

dated August 23, 2003, signed by LARRY SOLOMON, and drawn on the SAMS account, was used to make a "Down payment" on the Georgia property.

12. For example, and as set forth in Count Three of the Indictment, a review of Medicare records and records obtained from financial institutions reveals that BPS Medical, an entity controlled by LARRY SOLOMON, billed Medicare on March 25, 2004, under CPT Code 99349, for home care services allegedly performed on March 24, 2004 to patient RT562. Investigation reveals that patient RT562 did not receive medical treatment that corresponds to CPT Code 99349 on March 24, 2004. Instead, RT562 was in the hospital from March 23 through March 26 of 2004, receiving treatment by other health care providers. LARRY SOLOMON never saw RT562 on the date he billed Medicare for his services because that patient was in the hospital. Medicare reimbursed BPS Medical $101.50 for this claim by wiring funds to the BPS account at Wachovia Bank (#XXX2054) in April 2004. Thereafter, funds were transferred from the BPS account to a POTSOL Management Services, Inc. ("POTSOL") account (#XXX4626). After funds were transferred from the BPS account into the POTSOL account, Homecomings Financial automatically debited the POTSOL account $2,500 as a mortgage payment toward the Georgia property.

13. Investigation reveals that funds paid to purchase the Georgia property came from accounts into which proceeds from falsely billing Medicare and Medicaid had been moved. Between August, 2003 and December 2003, LARRY SOLOMON made payments on the Georgia property from the SAMS account into which, during this same period, over $73,450 of funds had been deposited from the BPS Medical and Rehab account that had received Medicare payments. Records indicate that over $42,000 of the payments made to Mr. King and/or to

Homecomings Financial toward the ownership of the residence located at xxxxxxxxxxxxxxxxxxxxxxxxx, Dallas, Georgia came from the SAMS account. Additionally, from February 2004 through August 2004, LARRY SOLOMON made $35,400 in payments to Mr. King and/or Homecomings Financial towards the purchase of the Georgia property from the POTSOL account (#XXX4626). During the same time frame, the POTSOL account had received deposits totaling $72,420 from BPS Medical accounts that had been derived from Medicare payments. Including the payments described above, as well as additional funds from another LARRY SOLOMON account, $89,000 went from accounts that LARRY SOLOMON controlled either to Mr. King, or to Homecomings Financial, during the time of the fraud scheme set forth in the Indictment, to purchase the xxxxxxxxxxxxxxxxxxxxxxxxxxx, Dallas, Georgia property.

14. Mr. King was interviewed by the FBI. He stated that in late 2004, LARRY SOLOMON stopped making payments on the Georgia property. Mr. King was contacted by the LARRY SOLOMON'S S-C Properties, Inc. business partner who informed Mr. King that POTSOL Management Services was not doing well financially and that the business partners were already in default on their agreement with Mr. King. Mr. King and the business partner worked out an agreement where the house would remain with Mr. King. But, because the parties would no longer be going through with the purchase of the Georgia property, LARRY SOLOMON and his business partner wanted to get $50,000 of their money back. On December 10, 2004, Mr. King returned $50,000 to S-C Properties, Inc. These funds were in turn deposited into the POTSOL account (#XXX4626) at Wachovia Bank that LARRY SOLOMON controlled.

15. Paying $50,000 back to S-C Properties, Inc. put a substantial financial strain on Mr.

King. A new agreement was made to lend $20,000 of the $50,000 back to Robert King. On December 27, 2004, $20,174.00 was wired from the POTSOL account (#XXX4626) at Wachovia Bank to Republic Title Company for the benefit of Mr. King. This $20,174, included a $74 recording fee for the title, a $100 attorney fee and $20,000 loan to King. Mr. King agreed to payback this $20,000 note, by October 1, 2005, to S-C Properties, Inc. The FBI reviewed the POTSOL account (#XXX4626), and learned that between the time that the $50,000 was deposited in, and the time that the $20,000 loan was provided back to King, there was a total of $62,000 deposited into the POTSOL account. This $62,000 was comprised of the $50,000 payment from King and another $12,000 in funds transferred into this account from the BPS Medical account and from the SAMS account, both of which were controlled by LARRY SOLOMON and both which had received funds from the Health Care Fraud scheme described in the Indictment during the times at issue.

    16. On or about September 1, 2005, your affiant became aware that Mr. King had arranged to refinance his property in Georgia in order to use the funds from this refinancing to payback the $20,000 that he owed LARRY SOLOMON before Mr. King could get his property back, unencumbered by any obligations owed to S-C Properties, Inc. or its partners. As described above, these loan repayment funds can be directly or indirectly traced to illegally obtained fraud proceeds that LARRY SOLOMON paid to purchase the Georgia property, some of which were then returned to LARRY SOLOMON or entities or accounts he controlled, and then partially lent back to Mr. King.

    17. The loan balance is due by October 1, 2005. Mr. King has indicated that he was told by LARRY SOLOMON's business partner that repayment of the $20,000 loaned from the

$50,000 that Mr. King returned to S-C Properties should be wired to a Wachovia Bank account, #xxxxxxxxxx7137, in the name of Solomon-Crozier Construction Company.

18. Mr. King has indicated that he will wire the $20,000 to that account on September 29, 2005. The $20,000 that Mr. King wires into Wachovia Bank account, #xxxxxxxxxx7137 are directly or indirectly traceable to proceeds of the Health Care Fraud offenses described herein and then laundered as described herein and after those funds are deposited into Wachovia Bank account #xxxxxxxxxx7137, all funds in that account are subject to seizure and forfeiture pursuant to Title 18, United States Code, Section 981 (a)(1)(A).

Wherefore, it is requested that a seizure warrant be issued for the following item:

> All funds on deposit at Wachovia Bank account, #xxxxxxxxxx7137, in the name of Solomon-Crozier Construction Company, on or after receipt of $20,000 from Mr. Robert King wired on September 29, 2005.

_____
Debra LaPrevotte, Special Agent, FBI

Sworn to and subscribed before me on this _____ day of September, 2005.

_____
United States Magistrate Judge